## FOR PUBLICATION

FILED

Oct 28 2013, 5:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**CHARLES W. LAHEY**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MARJORIE LAWYER-SMITH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CHAUNSEY L. FOX, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1304-CR-187 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable Jerome Frese, Judge
Cause No. 71D03-1112-MR-15

**October 28, 2013**

**OPINION - FOR PUBLICATION**

**DARDEN, Senior Judge**

STATEMENT OF THE CASE

Chaunsey L. Fox appeals his conviction of felony murder.  Ind. Code § 35-42-1-1 (2007).  We affirm.

ISSUES

Fox raises three issues, which we restate as:

I.        Whether the court erred in denying Fox's motions to dismiss.

II.       Whether the trial court exhibited bias toward Fox.

III.      Whether the prosecutor withheld exculpatory evidence.

FACTS AND PROCEDURAL HISTORY

On the night of March 9, 2009, South Bend Police Department officers were dispatched to investigate a report of a shooting.  They arrived at Eddie Williams' house and found his body in the backyard.  The body was on the ground near a car, and the car's engine was still running.  Williams had been shot once in the head.

A witness reported seeing men run away from the scene through an alley.  The men wore masks, and the witness saw at least two guns.  Officers searched the alley that night and found a handgun, which was later determined to be the murder weapon.  Officers also found several gloves and pieces of black cloth which had been used as masks.  The next day, officers searched the alley in daylight and found a pistol-grip shotgun in a trash can thirty to forty feet from where the handgun was found.

The gloves and cloth pieces were sent to a lab for DNA testing.  The police also sent to the lab DNA samples that they collected from various individuals over the course of the investigation.  DNA found on one of the masks and one of the gloves matched a

2

sample collected from Derek Fields. The police had interviewed Fields in July 2009, before the results of the DNA testing were known, and he had denied any involvement in the shooting. After the DNA match was discovered, Fields continued to deny any involvement in the shooting.

In June 2011, Fox was incarcerated in the St. Joseph County Jail on a charge unrelated to the current case. He contacted Detective James Taylor. Fox claimed to have information about Williams' homicide and wanted favorable treatment on his pending charge.

Taylor and another officer interviewed Fox on June 20, 2011. The interview was recorded. Fox claimed that Jason White ("Jason") shot Williams. He told Taylor that Jason arrived at his house immediately after the shooting. He stated Jason told him that he and his cousin Bruce White ("Bruce") had intended to rob Williams, but Jason shot Williams when he resisted. He further said that Jason was angry at Williams because Williams had sold Jason some crack cocaine, and Jason believed the cocaine was adulterated and of poor quality. He also told Taylor that Jason said he and Bruce had a lookout, but Fox denied knowing who the lookout was and denied being present at the shooting. Taylor then asked Fox if he knew a Derek Fields, and Fox said he had heard of him and had spoken to him on the phone but did not know him personally. Finally, Fox described with specificity the handgun that was used in the shooting and said it belonged to Jason. A description of the handgun had not been released to the public.

Later, Fox asked to speak with the officers again. On July 6, 2011, Taylor conducted a second interview with Fox, which was also recorded. Fox's attorney was

3

also present. Fox admitted to the officers that he had been present during the shooting. He repeated that Jason was angry at Williams for selling him poor quality cocaine and had recruited Fox to assist in the robbery. Fox said he was a lookout, and Jason and Bruce ambushed Williams. He told Taylor that Bruce had a pistol-grip shotgun, describing with specificity the shotgun that the officers had discovered the day after the murder. He further said Jason and Bruce wore masks, but he only put his hood up. In addition, he reiterated that Jason had the handgun and shot Williams when Williams resisted being robbed, and then the three men ran away.

Fox denied that anyone else participated in the shooting besides Jason, Bruce, and himself. Taylor then told Fox that the evidence showed that someone else was also there and, said that he could not help Fox unless Fox told the truth. At that point, Fox admitted that there was a fourth participant, but he claimed not to know that person's identity. The parties then took a break from the interview.

When the interview resumed, a deputy prosecutor entered the interview room at Fox's request. The deputy prosecutor said on the record that in exchange for Fox's information, the State would not charge him with murdering Williams if: (1) he was truthful, (2) he testified for the State against other individuals, if called upon, (3) he was not the shooter, and (4) he did not carry a gun during the crime. The deputy prosecutor also said he would consider a deal in Fox's pending case. After the deputy prosecutor left, Fox maintained that he still did not know the fourth person, claiming the individual attempted to hide his identity from Fox prior to and during the robbery. Fox further said

he would be unable to identify the person in a lineup because so much time had passed since that night. The State continued its investigation into the matter.

While he was incarcerated in the county jail, Fox apparently told several of his fellow inmates that he shot Williams. In addition, Fox told fellow inmate Shawn Fox ("Shawn" - no relation to Fox) that Derek Fields was with him at the time of the shooting. He also told the inmates that when he spoke with the police, he tried to place the blame for the murder on other people. After Fox's July 6, 2011 interview, several of the inmates contacted police officers and told them about Fox's statements.

In early 2012, Fields was incarcerated and facing unrelated federal charges. Fields provided a general cleanup statement regarding crimes he had been involved in, during which he admitted that he had participated in Williams' murder. He initially said that Fox and Jason were with him, but he later amended his statement to say that only he and Fox participated in the murder. Fields further admitted he carried a shotgun and said Fox shot Williams with the handgun. Fields also said that he and Fox had been friends for several years prior to the murder.

The State charged Fox with murder, attempted robbery, and felony murder on December 20, 2011.[1] Fox filed a combined motion to dismiss, to enforce plea agreement, and to suppress evidence. The court denied Fox's motion after an evidentiary hearing. The case went to trial, and the State presented recordings of Fox's June 20, 2011 and July 6, 2011 interviews to the jury, among other evidence. The jury did not find Fox guilty of

---

[1] Fox did not include the charging information in his Appellant's Appendix. However, he acknowledges in his Appellant's Brief that the State charged him as stated. Appellant's Br. p. 3.

murder but instead found him guilty of attempted robbery and felony murder. The trial court declined to enter judgment of conviction for attempted robbery. After the jury rendered its verdicts on March 8, 2013, but before the sentencing hearing, Fox filed a "renewed" motion to dismiss and to enforce plea agreement. Appellant's App. p. 12. The trial court denied Fox's motion at the beginning of the sentencing hearing and sentenced him on the felony murder conviction on April 8, 2013. This appeal followed.

DISCUSSION AND DECISION

I. MOTIONS TO DISMISS THE CHARGING INFORMATION

Fox argues that the court should have dismissed the murder charges or suppressed his recorded statements from the June 20, 2011 and July 6, 2011 interviews because he was immune from prosecution on those charges pursuant to his agreement with the State.[2] The State asserts that Fox breached the agreement, thereby rendering void the State's promise not to prosecute him for murder.

We start with the motion to dismiss that Fox filed prior to trial. A defendant may file a motion to dismiss an indictment or information. Ind. Code § 35-34-1-8 (1981). The court may grant a defendant's motion to dismiss if, among other grounds, the defendant has immunity with respect to the crimes at issue. Ind. Code § 35-34-1-4(a)(6) (1983). We review a trial court's ruling on a motion to dismiss a charging information for an abuse of discretion. *Matlock v. State*, 944 N.E.2d 936, 938 (Ind. Ct. App. 2011).

---

[2] Fox presents identical arguments in support of his claims for dismissal and for suppression of his recorded statements. For ease of discussion, in this analysis we refer only to his request to dismiss the information, but our analysis applies equally to the suppression issue.

6

When a defendant files a motion to dismiss an information, the facts alleged in the information are to be taken as true. *Delagrange v. State*, 951 N.E.2d 593, 594 (Ind. Ct. App. 2011), *trans. denied*. Facts permitted to be raised in a motion to dismiss typically concern only pretrial matters. *State v. Isaacs*, 794 N.E.2d 1120, 1122 (Ind. Ct. App. 2004). Consequently, questions of fact to be decided at trial or facts constituting a defense are not properly raised by a motion to dismiss. *Id.*

In this case, the parties admit that they had an agreement that the State would not prosecute Fox for murder if he: (1) was completely truthful, (2) cooperated by testifying for the State if needed, (3) did not carry a gun at any point during the murder, and (4) was not the actual shooter. The court held an evidentiary hearing on Fox's motion to dismiss, at which Fields testified that he and Fox initially tried to rob Williams, but the robbery resulted in a murder. Fields further stated that Fox carried the handgun that evening, wore a mask like Fields, and was the shooter. In addition, Fields testified that he had known Fox for several years prior to the shooting, contrary to the information Fox provided during the interviews. Jackie Parker testified at the hearing, and he said Fox told him in jail that he had shot Williams.

The parties' dispute at the evidentiary hearing focused on whether Fox had been truthful about his role in Williams' murder. This dispute called into question the credibility of Fox, Fields, Parker, and other witnesses. Witness credibility is generally a question of fact to be decided at trial. We thus conclude that the trial court did not abuse its discretion by denying Fox's motion to dismiss and allowing the jury to determine the issue of credibility and answer the question of who was telling the truth.

Fox nonetheless argues that he was entitled to enforce the State's promise not to prosecute him for murder because he relied on it. Our Supreme Court has stated that a court must enforce an agreement between the prosecution and the defendant "either if the State has materially benefitted from the terms of the agreement or if the defendant has relied on the terms of the agreement to his substantial detriment." *Badger v. State*, 637 N.E.2d 800, 804 (Ind. 1994). Here, there was a dispute at the time of the hearing on the motion to dismiss as to whether the State had materially benefitted from the agreement, because the State contended Fox's information was false and of no value. In addition, at the time of the hearing there was a dispute as to whether Fox had detrimentally relied on the agreement because he had already admitted his involvement in the robbery/murder (as a lookout) even before the deputy prosecutor entered the interview room and offered him the agreement. Subsequently, after further investigation by the State, the evidence revealed there was a substantial dispute as to whether Fox was telling the truth. In any event, Fox was only entitled to rely on the agreement if he kept his end of the bargain.

After the jury issued its verdicts and was discharged, but prior to the sentencing hearing, Fox filed a "renewed" motion to dismiss and for specific enforcement of the agreement, which the court denied. Appellant's App. p. 12. By statute, a defendant may only file a motion to dismiss on grounds of immunity "before or during trial." Ind. Code § 35-34-1-4(b). Thus, we conclude Fox's motion is more appropriately treated as a motion for judgment on the evidence under Trial Rule 50.

A party is entitled to judgment on the evidence when all or some of the issues in a case tried to a jury "are not supported by sufficient evidence or a verdict thereon is

clearly erroneous as contrary to the evidence because the evidence is insufficient to support it." Ind. Trial Rule 50. On appeal, we use the same standard of review as the trial court in determining the propriety of a judgment on the evidence. *Garcia v. State*, 979 N.E.2d 156, 158 (Ind. Ct. App. 2012). When the trial court addresses a motion for judgment on the evidence, it must view the evidence in a light most favorable to the party against whom judgment on the evidence would be entered. *Id.* A trial court may not invade the province of the jury by weighing the evidence presented or the credibility of witnesses. *Id.*

Fox argues that because the jury acquitted him of murder but found him guilty of felony murder, the jurors must have concluded that he did not personally shoot Williams but was merely liable for the murder as an accessory because he participated in the proposed robbery. He thus reasons that the jury agreed with him that he was merely a lookout, and that his version of events must be taken as true. Consequently, he concludes he did not lie to the State, that he was truthful, and the trial court was obligated to dismiss the murder charges because he did not violate the terms of his agreement and was entitled to immunity from prosecution for murder.

It is well settled in both criminal appeal and civil appeal contexts that we presume that the jury followed the law contained in the trial court's instructions and applied that law to the evidence before it. *Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 771 (Ind. Ct. App. 2009). We do not otherwise attempt to interpret the thought process of the jury in arriving at its verdict. *Jones v. State*, 689 N.E.2d 722, 724 (Ind. 1997).

9

The jury's acquittal of Fox for murder does not inevitably lead to a conclusion that it wholly accepted his version of events. For example, viewing the facts in the light most favorable to the State, jurors could have determined that Fox's friend Fields, rather than Jason and Bruce, participated in the crimes. Jurors could have also determined that Fox carried a gun on the night of the crimes but did not shoot Williams. In addition, they could have concluded that Fox accidentally shot Williams during the robbery, which would eliminate the intent to kill necessary for a murder conviction but would not prevent a conviction for felony murder. Any of these determinations would be consistent with the verdicts but would also establish that Fox lied to investigators about Fields' involvement or that Fox carried a handgun on the night in question, thereby breaching his agreement with the State. Fox has failed to establish a lack of evidence to support his conviction, and the court did not err in denying his renewed motion to dismiss and to suppress evidence.

## II. JUDICIAL BIAS

Fox argues that his conviction is improper because the trial judge demonstrated bias or prejudice against him in front of the jury.

A criminal defendant has a right to a fair trial before an impartial judge. *Harris v. State*, 963 N.E.2d 505, 506 (Ind. 2012). When the impartiality of the trial judge is challenged on appeal, we will presume that the judge is unbiased and unprejudiced. *Perry v. State*, 904 N.E.2d 302, 307 (Ind. Ct. App. 2009), *trans. denied*. To rebut that presumption, a defendant must establish from the judge's conduct actual bias or prejudice that places the defendant in jeopardy. *Massey v. State*, 803 N.E.2d 1133, 1139 (Ind. Ct.

10

App. 2004). Such bias and prejudice exists only where there is an undisputed claim or where the judge expressed an opinion of the controversy over which the judge was presiding. *Id.* Furthermore, a trial judge has a duty to conduct the trial in a manner calculated to promote the ascertainment of truth, fairness, and economy of time. *Id.* Within the scope of this duty is the authority to make impartial statements about the general admissibility of evidence. *Id.*

During the trial, Fox cross-examined Fields, and the following exchange occurred:

[Q:] Now, you said that Jason White though was involved with this?

[A:] Yes.

[Q:] And you knew that by telling the federal agents that Jason White was involved and was one of the three people that killed Mr. Williams, Eddie Williams, you knew that you were obligating yourself to testify against him in court?

[A:] Yes.

[Q:] And you were going to do that?

[A:] No. That's the whole reason why I came back the next week and admitted to having a shotgun.

[Q:] Well, on February 2nd why did you say that if you weren't willing to testify against him?

[A:] I wasn't going to testify against him. That's why I cleared it up.

[Q:] You thought that you could go to a Criminal Rule 11 proffer, tell them about a murder, and that they were going to give you consideration, not charging you in the murder, giving you a break on your federal charges, and you weren't going to have to testify about that?

11

[A:]        No, I knew I was going to have to testify. That's why I cleared it up and said he wasn't there.

[Q:]        Well, before you cleared it up, not only did you perfectly well intend to testify falsely against an innocent man on February 2nd, but you—

[JUDGE:]        I can't allow that form of a statement by you which is not a question but an accusation as to what he fully well intended. You don't read his mind. It's improper. And if you have a question, ask a question. Don't accuse the witness of something that's in your mind that you think is in his mind.

[Q:]        You went back four days later and picked Jason White's photograph out of a lineup; did you not?

[A:]        Yes.

Trial Tr. pp. 305-07.[3] We find that the judge's ruling on Fox's question was an impartial statement upon an evidentiary issue. The judge did not express an opinion on the merits of the case or on the witness's credibility but instead instructed trial counsel to ask a proper question. Fox argues that the judge improperly limited his question of Fields, but the record does not support that argument. After the judge interjected, Fox continued to question Fields in detail about his prior statements. We conclude that Fox has failed to establish judicial bias and prejudice, and he was not placed in jeopardy.

### III. WITHHOLDING OF EVIDENCE BY THE STATE

Fox claims the State withheld exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). To prevail on a *Brady* claim, a defendant must establish: (1) the prosecution suppressed evidence, (2)

---

[3] The transcript in this appeal consists of the trial and several hearings. The transcript volumes are not consecutively paginated, in violation of Indiana Appellate Rule 28(A)(2). We cite to the transcript volumes according to the trial or hearings contained therein.

the suppressed evidence was favorable to the defense, and (3) the evidence was material to an issue at trial. *Shelby v. State*, 986 N.E.2d 345, 358 (Ind. Ct. App. 2013), *trans. denied*. Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *Sangsland v. State*, 715 N.E.2d 875, 881 (Ind. Ct. App. 1999), *trans. denied*. Evidence is material if there is a reasonable probability that the result of the proceeding would be different if the State had disclosed the evidence to the defense. *Stephenson v. State*, 864 N.E.2d 1022, 1057 (Ind. 2007).

In this case, Fields and Shawn were both under investigation for federal crimes that were not related to the State's investigation of Fox. The federal proceedings resulted in proffers of statements of responsibility and plea agreements by Fields. Fox argues that he should have been provided with those documents for impeachment purposes.

The record reflects that the State turned over to Fox all relevant documents in its possession. In an October 15, 2012 letter to Fox's counsel, the deputy prosecutor described the status of Fields' and Shawn's federal cases and provided documents from those cases. Fox conceded at a subsequent hearing, "I might point out that I have no question at all that [the deputy prosecutor] is supplying what he has." Oct. 18, 2012 hearing, Tr. p. 49. Thus, the State did not suppress evidence. *See Williams v. State*, 757 N.E.2d 1048, 1063 (Ind. Ct. App. 2001) (the State did not commit a *Brady* violation with respect to Williams' cellular telephone records because it turned the records over to Williams and listed a cellular telephone representative as a witness), *trans. denied*.

Fox, however, argues that the State had a duty under *Brady* to obtain all relevant documents from federal agencies and turn them over to him. He cites several cases from

other jurisdictions and *Bunch v. State*, 964 N.E.2d 274 (Ind. Ct. App. 2012), *trans. denied*, in support of his argument. In *Bunch*, a panel of this Court concluded that the State suppressed evidence in violation of *Brady* because the State did not disclose to Bunch reports and notes produced by personnel at the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"). The Court determined that although the ATF was a separate agency and kept the documents on its premises rather than giving them to the State, the State had a duty to obtain the documents and disclose them to Bunch because "the ATF was acting at the behest of the State" in testing various pieces of evidence. *Id.* at 301.

*Bunch* is distinguishable from Fox's case. A review of the record demonstrates that the federal prosecutors and law enforcement agencies working on Fields' and Shawn's cases were not acting on behalf of or at the behest of the State. Rather, both the State and federal authorities shared information that was relevant to their respective and separate investigations, and the federal authorities released to the State such information that it deemed proper.[4] Thus, *Bunch* does not compel a conclusion here that the State suppressed information by failing to obtain all documents from federal agencies, and we conclude that there was no *Brady* violation.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

---

[4] There is also no evidence that Fox made any efforts to obtain documents from federal authorities. During a pretrial hearing, Fox told the trial court he was aware that he could subpoena such documents. However, he never pursued such a remedy.

14

BAKER, J., and BAILEY, J., concur.